T.C. Memo. 2003-304

UNITED STATES TAX COURT

H. ROBERT FEINBERG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1757-95.                    Filed November 3, 2003.

<u>Christopher S. Rizek</u>, for petitioner.

<u>Louise R. Forbes</u> and <u>D. Sean McMahon</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  This case was assigned to Special Trial
Judge Norman H. Wolfe pursuant to the provisions of section
7443A(b)(4) in effect when these proceedings commenced and Rules
180, 181, and 183.  Unless otherwise indicated, section
references are to the Internal Revenue Code in effect at relevant
times, and Rule references are to the Tax Court Rules of Practice

and Procedure.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  In a so-called affected items notice of deficiency, respondent determined additions to tax with respect to petitioner's 1982 Federal income tax of $6,115 under section 6659 for valuation overstatement, $1,260 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on $25,205, the amount of the underpayment attributable to negligence.  The underpayment was determined pursuant to a partnership-level proceeding.  See secs. 6221-6233.  After concessions,[1] there are two issues remaining for decision.  The first issue is whether petitioner is liable for the additions to tax under the provisions of section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations.  We hold that he is liable for these additions to tax.  The second issue is whether petitioner is entitled to the benefits of a settlement

---

[1]  By stipulation, petitioner concedes the imposition of the valuation overstatement addition to tax under sec. 6659.  In addition, petitioner concedes that the limitations period remains open for assessment and collection of any penalties, additions to tax, or interest attributable to partnership items for the 1982 tax year that may be held to be due from petitioner.  Petitioner previously raised the statute of limitations as a defense in his petition.

offer that was made available to some other taxpayers. We hold that he is not entitled to the benefits of that settlement offer.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the attached exhibits are incorporated by this reference.[2] H. Robert Feinberg (petitioner) resided in New York, New York, at the time he filed the petition in this case.

A. The Plastics Recycling Transaction

This case is part of the Plastics Recycling group of cases. The issues in this group of cases center about a circular multistep transaction involving the sale and lease of machines designed to recycle plastic scrap. The additions to tax arise from the disallowance of losses, investment credits, and energy credits petitioner claimed with respect to a New York limited partnership called SAB Foam Recycling Associates (SAB Foam).

For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C.

_____

[2] The parties have stipulated that testimony and documentary evidence admitted in Cohen v. Commissioner, T.C. Memo. 2003-303, and in Lewin v. Commissioner, T.C. Memo. 2003-305, shall be admitted in the present case, subject to the parties' relevance objections, if any. In addition, the parties have agreed to add to the record as exhibits the testimony of Elliot Miller in Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993), and of Stuart Becker in Jaroff v. Commissioner, T.C. Memo. 1996-527.

Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993). The parties have stipulated that the underlying transactions involving the recycling machines (recyclers) in this case are substantially similar to the transactions involving the Sentinel polyethylene (EPE) recyclers considered in Provizer and the Sentinel polystyrene (EPS) recyclers considered in Gottsegen v. Commissioner, T.C. Memo. 1997-314.

In a series of simultaneous transactions that for convenience are referred to herein as the SAB Foam transactions, Packaging Industries Group, Inc. (PI), of Hyannis, Massachusetts, manufactured and sold[3] four EPS[4] recyclers to Ethynol Cogeneration, Inc. (ECI), for $6,080,000 ($1,520,000 per machine). ECI agreed to pay PI $451,000 for the four recyclers

---

[3] Terms such as "sale" and "lease", as well as their derivatives, are used for convenience only and do not imply that the particular transaction was a sale or lease for Federal tax purposes. Similarly, terms such as "joint venture" and "agreement" are also used for convenience only and do not imply that the particular arrangement was a joint venture or an agreement for Federal tax purposes.

[4] In Provizer v. Commissioner, supra, the transaction involved EPE recyclers, but the EPS recycler partnerships and the EPE recycler partnerships are essentially identical. See Davenport Recycling Associates v. Commissioner, T.C. Memo. 1998-347, affd. 220 F.3d 1255 (11th Cir. 2000); see also Gottsegen v. Commissioner, T.C. Memo. 1997-314 (involving both the EPE and the EPS recyclers).

at the closing, with the balance of $5,629,000 financed through a 12-year nonrecourse promissory note (ECI note). Each monthly installment on the ECI note was $81,250.

Simultaneously, ECI resold the recyclers to F&G Equipment Corp. (F&G) for $7 million. F&G agreed to pay ECI $513,000 at the closing, with the balance of $6,487,000 financed through a purportedly partial recourse promissory note (F&G note). The F&G note was recourse against F&G to the extent of 20 percent of its face value. However, the recourse portion was payable only after F&G satisfied the nonrecourse portion of the note. Each monthly installment on the F&G note was $81,250. In turn, F&G leased the recyclers to SAB Foam for a monthly base rent of $81,250. Pursuant to the lease and in accordance with applicable provisions of the Internal Revenue Code and the Treasury regulations, F&G elected to treat SAB Foam as having purchased the recyclers for purposes of the investment and business energy tax credits.

Simultaneously, SAB Foam entered into a joint venture with PI and Resin Recyclers, Inc. (RRI). The joint venture agreement provided that RRI was to assist SAB Foam with the placement of recyclers with end-users and that PI was to pay a monthly joint venture fee to SAB Foam of $81,250.

In connection with the SAB Foam transactions, therefore, the arrangement was that PI would pay a monthly joint venture fee to

SAB Foam, in the same amount that SAB Foam would pay monthly to F&G as rent, in the same amount that F&G would pay monthly to ECI on the F&G note, in the same amount that ECI would pay monthly to PI on the ECI note. In connection with these arrangements by PI, ECI, F&G, SAB Foam, and RRI, these monthly payments were offsetting, so they could be kept as bookkeeping entries with no money actually changing hands.

On its 1982 Form 1065, U.S. Partnership Return of Income, SAB Foam reported that the four recyclers had an aggregate basis of $7 million, or $1,750,000 each, for purposes of the investment and business energy tax credits. In the present case, the undisputed evidence, including the stipulation of the parties, establishes that the recyclers were not properly valued at $1,750,000 but instead had a maximum value of $30,000 to $50,000 each. SAB Foam reported a net ordinary loss of $662,556. SAB Foam included the portion of credits and losses attributed to petitioner on the Schedule K-1, Shareholder's Share of Income, Credits, Deductions, Etc., issued to petitioner and filed with SAB Foam's partnership tax return.

B. Private Offering Memorandum

The private offering memorandum (memorandum) that generally was distributed to potential investors contemplated the creation of SAB Foam. SAB Management, Ltd. (SAB Management), a New York corporation, was SAB Foam's general partner, its tax matters

partner (TMP), and a 1-percent owner.  The limited partners, or investors, owned the remaining 99 percent of SAB Foam.

The memorandum informed investors that the business of SAB Foam would be conducted in accordance with the transaction described above.  The memorandum warned potential investors of significant business and tax risk factors associated with investments in SAB Foam.  The memorandum was replete with warnings.  In bold capital letters, the memorandum unequivocally stated:  **"THIS OFFERING INVOLVES A HIGH DEGREE OF RISK"**.

Specifically, the memorandum warned potential investors that:  (1) There was a substantial likelihood of audit by the Internal Revenue Service (IRS); (2) "On audit, the purchase price of the Sentinel EPS recyclers to be paid by F&G to ECI may be challenged by the * * * [IRS] as being in excess of the fair market value thereof, a practice followed by * * * [the IRS] in transactions it deems to be 'tax shelters'.  Such purchase price is the basis for computing the regular investment and energy tax credits to be claimed by * * * [SAB Foam and ultimately by its partners]"; (3) the partnership had no prior operating history; (4) the general partner had limited experience in marketing recycling or similar equipment; (5) the limited partners would have no control over the conduct of the partnership's business; (6) there was no established market for the sale, leasing, or

licensing of Sentinel EPS Recyclers; and (7) certain potential conflicts of interest existed.

The memorandum projected that in the initial year of investment an investor contributing $50,000 for one unit would receive total investment tax credits and business energy credits of $81,529 plus tax deductions of $38,768.[5] The memorandum stated that an investor in SAB Foam was required to have an individual net worth and/or net worth with a spouse of $1 million, inclusive of residences and personal property, or income of $200,000 per year for each unit of investment.

The memorandum included a marketing report by Stanley Ulanoff (Ulanoff), a marketing consultant and professor, and a technical opinion by Samuel Z. Burstein (Burstein), a mathematics professor. The memorandum warned investors not to rely on the statements and opinions contained in the memorandum but to conduct an independent investigation.

The memorandum included a Form of Opinion of Counsel (tax opinion) prepared by Boylan & Evans, a New York law firm. The tax opinion, addressed only to the general partner, included in the first paragraph the following disclaimer:

> We have consented to your inclusion of the proposed form of this letter in the Memorandum, but this letter is intended for your own individual guidance and for

---

[5] Regardless of the memorandum, the parties have stipulated that the projected tax deductions would be $39,988 for each $50,000 unit of investment.

the purpose of assisting prospective purchasers and their tax advisors in making their own analysis, and no prospective purchaser is entitled to rely upon this letter.

The tax opinion expressly warned that the investment and energy tax credits available to limited partners would be reduced or eliminated if the partnership could not demonstrate that the price paid for the recyclers approximated their fair market value. The tax opinion did not purport to rely on any independent confirmation of the fair market value of the recyclers. Instead, the tax opinion clearly relied on Ulanoff's conclusion that the purchase price to be paid by F&G was fair and reasonable. The tax opinion also states: "PI, ECI, F&G, and the Partnership have represented to us that the prices paid by ECI and by F&G and the terms of the Lease were negotiated at arm's length." The tax opinion concludes that the basis to the partnership upon which the aggregate investment and energy tax credits are to be computed is the price paid by F&G for the recyclers.

C. <u>Individuals Involved</u>

Petitioner attended New York University, School of Commerce, Accounts, and Finance on a university scholarship and graduated in 3-1/2 years. He joined the Naval Reserve while attending Harvard Law School during the Korean War and graduated from the law school in 1953. He then attended Officer's Candidate School, received his commission, transferred to the Naval Supply Depot,

Bayonne, New Jersey, for supply corps school, and then, at the request of the captain of the base, was assigned to the Naval Supply Depot, at Bayonne.  He served 3 years on active duty with the Navy, primarily at that Supply Depot, in charge of purchasing and contracting.  Within 2 weeks of separation from service he was hired by the New York law firm of Jacobs & Persinger, and he became a partner there in 1961.  Petitioner had some experience in litigation and taxation, but later his practice focused on corporate financial and commercial transactions. Petitioner described himself as a member of "the core of the corporate and corporate finance bar within the Wall Street area * * * [that] were fairly well known among each other and * * * were constantly working on deals".  In 1978, he formed a new firm with an attorney who specialized in real estate transactions, and later that firm merged into the law firm of Lans, Feinberg, & Cohen (LFC).

Stuart Becker (Becker) organized and promoted SAB Foam. Becker was the sole shareholder of Scanbo Management, Ltd. (Scanbo), which wholly owned SAB Management.  Becker served as the president of SAB Management and principal of Stuart Becker & Co., P.C. (Becker Co.), an accounting firm that emphasized tax matters.  He does not have an engineering background, and he is not an expert in plastics materials or plastics recycling.

In his practice Becker specialized in tax matters generally and particularly in tax-advantaged investments, so he had considerable experience involving so-called tax shelter transactions. Becker received his B.S. degree in accounting from New York University in 1964 and an M.B.A. in taxation from New York University School of Business Administration in 1973. He passed the certified public accountancy test in 1967 and was the winner of the gold medal, awarded for achieving the highest score on the examination for the year. Since early 1966, Becker has practiced as an accountant in the tax area. From 1964 until 1972, he worked for the accounting firm of Touche, Ross & Co., and in 1972 he joined the accounting firm of Richard A. Eisner & Co. (Eisner Co.) as the partner in charge of the tax department. In 1977, he was the founder and principal owner of Becker Co. Becker learned of the Plastics Recycling transactions in 1981 when a prospective client presented him with an offering memorandum concerning one of the transactions. Subsequently he organized limited partnerships to offer the Plastics Recycling transaction to his clients and others.

Robert S. Cohen (Cohen) received his B.A. degree from Alford University and his J.D. degree from Fordham University. After graduating from law school in 1962, Cohen enlisted in the military and was released from active duty as a first lieutenant. He then worked for a law firm in New York until he formed the law

firm of LFC in 1968.  In practice he was primarily a commercial litigator until the early eighties, when New York passed an equitable distribution law with respect to divorce.  Then he concentrated his practice on family law.

Cohen had met Becker through his relationship with Richard Eisner, Becker's partner at Eisner Co., and through his stepbrothers, who were Becker's clients.  Cohen retained Becker on several occasions as an accounting expert.  In turn, Becker retained Cohen and LFC on various legal matters, including his own divorce.

Petitioner met Becker through Cohen, his then partner at LFC, and developed a professional relationship with him.  This relationship included referrals between LFC and Becker Co., as well as personal matters.  Petitioner considered Becker a very bright and sophisticated accountant.  Petitioner retained Becker to review LFC's accounting procedures and practices and for his return preparation services.  Becker, in turn, retained petitioner to protect his interests as a promoter for SAB Foam, as well as for a partnership called SAB Resource Recycling Associates (SAB Resource).  Becker did not employ petitioner to represent the partnerships but to advise him for his own protection as their promoter.

Elliot Miller (Miller) was one of the key figures in the Plastics Recycling transactions and an acquaintance of Becker.

Miller was the corporate counsel to PI for many years and was a 9.1-percent shareholder of F&G. He also represented F&G, Burstein, and Raymond Grant, who was the sole shareholder of ECI. Miller has practiced law from 1958 to the present, primarily in the area of business and tax transactions and litigation. For some years he practiced as a partner in the firm of Miller & Summit. Petitioner was familiar with Miller's reputation as a competent corporate attorney.

Malcolm I. Lewin (Lewin) graduated from the City College of New York and graduated from New York University Law School in 1966. In 1967 Lewin came to work for Miller & Summit as the two-partner partnership's only associate. He worked primarily on corporate and transactional matters. He was employed by Miller & Summit for 4 years. During that time, he performed a variety of professional services for PI, which was a major client for Miller. On many occasions he visited the premises of PI, which then were located in New Jersey and under different ownership than in 1982. After his employment by Miller & Summit ended in 1971, Lewin joined LFC. Thereafter, Lewin only rarely spoke with Miller.

Herbert Dooskin (Dooskin) received a B.A. in economics from City College of New York and an M.B.A. from Baruch College. He began his career as a financial accountant in 1962 with Alexander Grant & Co. (Alexander Grant), an accounting firm currently known

as Grant Thornton.  He became a partner in 1970, and when he left the firm in 1986 for employment by a client, Dooskin was the managing partner of the New York office and chairman of the firm's executive committee.  Dooskin was primarily an auditor and was not a tax accountant.  Dooskin had met Lewin when they were in college, and they served together in the Army.  In 1982, Lewin brought the SAB Foam memorandum to Dooskin for review.  Dooskin passed the memorandum on to Ronald Sacco (Sacco), a tax professional at Alexander Grant, for review.  According to Dooskin, Sacco's view was that the investment and the economics of the deal were "dependent upon the valuation of the equipment".  After Dooskin and Sacco each spent about 3 hours reviewing the matter, Dooskin concluded that the proposal "looked like a legitimate business, * * * compressing plastic, and that it was better than most".  Neither Dooskin nor Sacco performed an independent analysis of the valuation of the recyclers.  All of Dooskin's and Sacco's information relating to the valuation of the recyclers came from either Lewin or the memorandum.  Dooskin made no separate charge to Lewin for the few hours he and his associate spent examining the memorandum.

D.  <u>Partnership-Level Litigation</u>

On August 15, 1988, respondent issued a notice of proposed adjustments to tax return to SAB Foam for 1982 and 1983.  On September 28, 1988, Robert L. Steele, a tax partner with Becker

Co., submitted a protest letter (protest letter) to respondent on behalf of SAB Management.  The protest letter included the following statement:

> We hereby agree to follow the Tax Court's decision in the <u>lead</u> cases selected in accordance with the Order of June 12, 1987, such cases being:
>
>> 1. Elliot I. Miller, Petitioner
>> v. Commissioner of  Internal Revenue, Respondent, Docket No. 10382-86
>>
>> 2. Elliot I. Miller and Myra K. Miller, Petitioner Commissioner of Internal Revenue, Respondent, Docket No. 10383-86
>>
>> 3. *Leo Fine and Judith H. Fine, Petitioners
>> v. Commissioner of Internal Revenue, Respondent, Docket No. 35437-85
>
> *        *        *        *        *        *        *
>
> * New controlling case:
>
>> Harold M. Provizer and Joan Provizer, Petitioners
>> v. Commissioner of Internal Revenue, Respondent, Docket No. 27141-86.

On January 20, 1989, on behalf of SAB Foam, Becker submitted the following notice to respondent:

> In our protest dated September 28, 1988, we stated that the Partnership agreed to be bound by the lead cases (Fine, Miller and Miller).
>
> Due to various changes in circumstances including but not limited to a settlement of all such then pending lead cases, the Partnership hereby withdraws its statement to be bound by such cases or any other case.

Becker mailed this notice by certified mail, return receipt requested, and signed it "Stuart Becker, Tax Matters Partner".

On December 9, 1991, respondent issued a notice of final partnership administrative adjustment (FPAA) to SAB Management for 1982. In the FPAA, respondent disallowed all items of income, losses, deductions, and credits reported with respect to SAB Foam's equipment leasing activities for 1982. Accordingly, respondent: (1) Increased ordinary income by $662,556; (2) determined that SAB Foam's investment and business energy tax credits with respect to the recycling equipment were zero, instead of the $7 million claimed as the qualified investment on the partnership tax return; and (3) increased SAB Foam's "other income" by $5,626.

Subsequently, SAB Foam's TMP filed a petition with the Court. On September 7, 1993, the Court entered a decision in SAB Foam Recycling Associates 1982 v. Commissioner, docket No. 5103-92. This decision reflected a full concession by SAB Foam of all items of income (loss) and credit previously claimed for the partnership.

E. Petitioner's Introduction to Plastics Recycling

In 1981 and 1982, petitioner, Cohen, and Lewin were partners in LFC. In 1981 Becker retained petitioner to advise him for his own protection relating to SAB Resource, a limited partnership structured substantially like SAB Foam. Petitioner received the offering materials for SAB Resource and, according to his testimony, performed a "very, very careful and detailed study of

the entire document and the supporting documents."  After petitioner reviewed the offering materials and discussed the investment with his partners Cohen and Lewin, petitioner decided to purchase a quarter unit in SAB Resource for $12,500.[6] Petitioner had no experience with the plastics materials or the plastics recycling industry.

On January 14, 1982, petitioner received a letter from SAB Management, as general partner of SAB Resource, signed by Becker, stating that the transaction contemplated by SAB Resource was complete and distributing a modest initial royalty.  On June 7, 1982, SAB Management sent a memo to the limited partners, including petitioner purporting to update the status of his investment in SAB Resource.

In 1982, Becker retained petitioner again, but this time to advise him for his own protection relating to SAB Foam. Petitioner performed a review of the memorandum as he had with the offering materials for SAB Resource.  He also met with Becker, Boylan & Evans, and Miller to review the memorandum, according to his testimony, "line by line, point by point". According to the Schedule K-1 issued by SAB Foam to petitioner

---

[6]  Petitioner testifies that he invested $12,500 in SAB Resource, but his 1981 Form 1040X, Amended U.S. Individual Income Tax Return, shows a reversal of the deduction of his share of the operating loss ($19,548) and investment tax credit ($41,268) relating to SAB Resource.  These figures indicate a $25,000 investment, a half-unit investment, in SAB Resource.

for 1982, and reflected on petitioner's 1982 Federal income tax
return, petitioner invested $12,500 and acquired a 1.455882-
percent limited partnership interest in SAB Foam's profits,
losses, and capital.  On his 1982 tax return, petitioner claimed
an ordinary loss of $9,646 from SAB Foam and an investment and
energy tax credit of $20,382.[7]  Petitioner later filed a 1982
Form 1040X, Amended U.S. Individual Income Tax Return, dated
December 30, 1986, reversing the deduction of his share of the
operating loss ($9,646) and the investment tax credit ($20,382)
relating to SAB Foam.

                            OPINION

    We have decided many Plastics Recycling cases.  Most of
these cases, like the present case, have presented issues
regarding additions to tax for negligence.  See, e.g., Weitzman
v. Commissioner, T.C. Memo. 2001-215; Thornsjo v. Commissioner,
T.C. Memo. 2001-129; West v. Commissioner, T.C. Memo. 2000-389;
Barber v. Commissioner, T.C. Memo. 2000-372; Barlow v.
Commissioner, T.C. Memo. 2000-339, affd. 301 F.3d 714 (6th Cir.
2002); Ulanoff v. Commissioner, T.C. Memo. 1999-170; Greene v.
Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C.
Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n.13

---

[7] The parties have stipulated that the amount reported on
petitioner's 1982 tax return as unadjusted basis of new recovery
property eligible for investment credit was $101,912, which
resulted in a total investment credit of $20,382.

(and cases cited therein), affd. sub nom. <u>Addington v. Commissioner</u>, 205 F.3d 54 (2d Cir. 2000).  Although we have considered each case on its own particular facts and circumstances, in all but two of the Plastics Recycling cases[8] we found the taxpayers liable for the additions to tax for negligence.

In <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, the test case for the group of cases, we resolved the Plastics Recycling issues as follows:  (1) We found that each recycler had a fair market value of not more than $50,000; (2) we held that the transaction, which was virtually identical to the transaction in the present case, was a sham because it lacked economic substance and a business purpose; (3) we sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) we sustained the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes related directly to the overvaluation of the recyclers; and (5) we held that the partnership losses and tax credits claimed with respect to the Plastics Recycling partnership at issue were attributable to tax-motivated transactions within the meaning of section 6621(c).  We also found that other recyclers were commercially available

---

[8]  In <u>Dyckman v. Commissioner</u>, T.C. Memo. 1999-79, and <u>Zidanich v. Commissioner</u>, T.C. Memo. 1995-382, we held the taxpayers were not negligent with respect to their participation in the Plastics Recycling program.  Both cases involved unusual circumstances not present in this case.

during the years in issue.  See id.  In reaching the conclusion

that the transaction lacked a business purpose, this Court relied

heavily upon the overvaluation of the recyclers.  Similarly, in

Gottsegen v. Commissioner, T.C. Memo. 1997-314, we found that

each EPS recycler had a fair market value of not more than

$50,000 and relied heavily on the overvaluation of the recyclers

in concluding that the taxpayer was negligent and liable for

accuracy-related penalties.  See Addington v. Commissioner,

supra.

## Issue 1.  Section 6653(a)(1) and (2) Additions to Tax for Negligence

Section 6653(a)(1) provides for an addition to tax equal to

5 percent of the underpayment if any part of the underpayment of

tax is due to negligence or intentional disregard of rules or

regulations.  Section 6653(a)(2) provides for an addition to tax

equal to 50 percent of the interest payable with respect to the

portion of the underpayment attributable to negligence or

intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due

care that a reasonable and ordinarily prudent person would

exercise under the circumstances.  See Neely v. Commissioner, 85

T.C. 934, 947-948 (1985).  The pertinent question is whether a

particular taxpayer's actions are reasonable in light of the

taxpayer's experience, the nature of the investment, and the

taxpayer's actions in connection with the transactions.  See

Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973); see also Turner v. Commissioner, T.C. Memo. 1995-363 ("When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment."). The determination of negligence is highly factual.

Respondent determined that petitioner is liable for negligence under section 6653(a)(1) and (2) with respect to the underpayment of tax attributable to petitioner's investment in SAB Foam. Respondent's determination of negligence is presumed correct, and petitioner has the burden of proving that he was not negligent. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Addington v. Commissioner, supra; Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).[9]

A taxpayer may avoid liability for negligence under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice. United States v. Boyle, 469 U.S. 241, 250-

_____

[9] Cf. sec. 7491(c), which places the burden of production on the Commissioner with respect to a taxpayer's liability for penalties and additions to tax. Sec. 7491(c) is effective for court proceedings arising in connection with examinations commencing after July 22, 1998. Petitioner does not contend, nor is there evidence, that the examination commenced after July 22, 1998, or that sec. 7491(c) is applicable in this case.

251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence but rather a factor to be considered. Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, supra at 408; see Freytag v. Commissioner, supra; Sann v. Commissioner, T.C. Memo. 1997-259.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. Goldman v. Commissioner, supra; Sann v. Commissioner, supra; see Berry v. Commissioner, T.C. Memo. 2001-311; Carroll v. Commissioner, T.C. Memo. 2000-184. Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. See David v. Commissioner, supra; Goldman v. Commissioner, supra.

Petitioner primarily contends that he was not negligent because he reasonably relied on the memorandum, the supporting documents to the memorandum, and his advisers. Petitioner had no

education or experience in plastics materials or plastics recycling, nor had he seen a Sentinel EPS recycler, when he invested in SAB Foam.  Moreover, he did not consult with anyone who had such expertise in plastics or plastics recycling.  The memorandum was essentially a sales-oriented document, and it contained numerous warnings that prospective investors should not rely on it.  Petitioner's advisers either lacked knowledge about the subject of the proposed investment or were part of the sales group and therefore inherently and obviously unreliable.  Under the circumstances of this case petitioner's purported reliance on the materials in the memorandum, as well as his advisers, does not relieve him of liability for the additions to tax for negligence.  Petitioner argues that he is different from the numerous other investors who have negligently speculated on the Plastics Recycling deal because he or his friends had a special relationship with either Becker or Miller.  As explained below, we consider this argument to be contrary to the facts of this case and wholly unpersuasive.

A.  The Memorandum and Petitioner's Colleagues

1.  The Memorandum

Petitioner contends that before purchasing shares in SAB Foam he read the memorandum and its accompanying materials.  The purported value of the recyclers is what generated the deductions and credits.  The memorandum clearly reflects this circumstance.

The recyclers, which in fact have a value of no more than $50,000 each, were reported by SAB Foam to have a basis of $1,750,000 each. As a result of the purported value of the recyclers, petitioner's investment of $12,500 produced for him on his 1982 tax return claimed tax credits of $20,382 and deductions of $9,646. The direct benefits claimed on petitioner's tax return, from the tax credits alone, far exceeded his cash investment. Like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, [petitioner] never had any money in the deal." Under these circumstances, a reasonably prudent person would have asked a qualified adviser whether such a windfall were not "too good to be true." See McCrary v. Commissioner, 92 T.C. 827, 850 (1989).

The memorandum included numerous caveats and warnings regarding the business and tax risks of SAB Foam. It stated that the offering involved a high degree of risk and that each offeree should consult his own professional advisers as to legal, tax, accounting, and other matters relating to any purchase of any units in the partnership. A careful consideration of the memorandum, and the discussion of high writeoffs and risk of audit, would have alerted a prudent investor to question the nature of the promised tax benefits.

Moreover, the tax opinion made clear that there was no independent evaluation of the SAB Foam transactions. The opinion

indicated that Boylan & Evans relied on the statements of the general partner and "other statements of fact and opinion furnished to us by persons familiar with the transaction described in the Memorandum." Boylan & Evans clearly based its conclusion about the fair market value of the recyclers on the assumption that the parties to the transactions had negotiated prices at arm's length. In light of the close relationships existing among the parties to the SAB transactions and the enormous price paid for the recyclers (largely with nonrecourse notes exchanged in a plainly circular transaction), petitioner should have questioned whether the prices were in fact negotiated at arm's length. Under these circumstances, petitioner's claim that he reasonably and in good faith relied on the tax opinion is unconvincing. A sophisticated, experienced, and intelligent lawyer like petitioner would know, or at least should know, better than to rely blindly upon a document with the warnings and defects of the memorandum.

Petitioner's contention that he reasonably relied on the expert opinions of Ulanoff and Burstein is unjustified. He testified that he had reviewed the memorandum, had discussed the valuation of the recyclers with Becker, Miller, Cohen, and Lewin, and had "no suspicion" that the opinions by Ulanoff and Burstein "could not be relied upon." According to petitioner and his partners, Becker gave all indications that the valuations were

reliable and Miller specifically stated so.  Neither Ulanoff nor Burstein was an expert in plastics or plastics recycling, and both relied on information provided by PI and other parties related to the transaction in providing their reports.  In addition, Ulanoff and Burstein each owned an interest in at least one partnership that owned recyclers as part of the Plastics Recycling program.  See, e.g., Jaroff v. Commissioner, T.C. Memo. 1996-527.  Petitioner did not independently obtain these individuals' advice but rather received their reports as part of the promotional material received from SAB Foam.  Reliance on the memorandum, and the reports therein, is simply an inadequate defense for petitioner.  Given the well-disclosed fact that the investment and energy tax credits generated by SAB Foam depended on the fair market value of the recyclers, petitioner should have made inquiries about the value of the recyclers rather than merely relying on the promotional reports of Ulanoff and Burstein.

2.  Becker

As we have recited above, petitioner contends that both he and his partner, Cohen, had a special relationship with Becker and therefore were entitled to rely upon him as his other clients were not.

At the outset the Court noted that Becker was on petitioner's witness list, but that petitioner's counsel had

decided not to call him.  The Court questioned counsel in this matter because of petitioner's specific reliance on his relationship with Becker.  However, petitioner's obviously well-prepared and capable counsel adhered to his decision not to call upon Becker concerning the supposedly special relationship but, instead, to rely upon Becker's extensive testimony in the <u>Jaroff</u> case.[10]  See <u>Bresler v. Commissioner</u>, 65 T.C. 182, 188 (1975), <u>Pollack v. Commissioner</u>, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968), and <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947), to the effect that the failure of a party to offer

---

[10]  The colloquy concerning petitioner's counsel's failure to provide Becker's testimony about his close relationship with petitioner and Cohen is as follows:

> THE COURT:  I didn't hear you mention Mr. Becker's name as a witness.

> MR. RIZEK:  We are not going to call Mr. Becker as an additional witness.  I think the 300 pages or so that we stipulated to in the supplemental stipulation are more than adequate to cover any points we wanted to establish with Mr. Becker.

> THE COURT:  Well, that may be, but you're going to talk a lot about how these parties all had a relationship with Mr. Becker and all that sort of thing and you're not calling Mr. Becker?

> MR. RIZEK:  We are not calling Mr. Becker.  We don't think it's necessary, Your Honor.  I don't think there's going to be any doubt at the conclusion of the evidence that's presented here that these Petitioners had fairly long standing relationships independent of this particular transaction with Mr. Becker.

available testimony gives rise to the inference that it would have been unfavorable to his contention. Accordingly, we review Becker's testimony in the Jaroff case below and consider the extent of his expertise and the likelihood that he gave special assurances or guarantees to petitioner.

Becker had no education, special qualifications, or professional skills in plastics engineering, plastics recycling, or plastics materials. In evaluating the Plastics Recycling transactions and organizing the SAB recycling partnerships, Becker supposedly relied upon: (1) The memorandum and the accompanying materials; (2) a tour of the PI facility in Hyannis; (3) discussions with insiders to the transactions; (4) Michael Canno (Canno), a client of Becker Co.; and (5) his investigation of the reputation and background of PI and persons involved in the transactions.

Despite his lack of knowledge regarding the product, the target market, and the technical aspects at the heart of the Plastics Recycling transactions, Becker did not hire an expert in plastics materials or plastics recycling. The only independent person having any connection with the plastics industry with whom Becker spoke was Canno. Canno was part owner and the production manager of Equitable Bag Co., a manufacturer of paper and plastic bags. Becker spoke to Canno about the recyclers and PI, but he did not hire or pay him for any advice. Canno did not visit the

PI plant in Hyannis, see or test a recycler, or see or test any of the output from a recycler or the recycled resin pellets after further processing. According to Becker, Canno endorsed the Plastics Recycling transactions after reviewing the memorandum. When asked whether Canno had performed any type of comparables analysis, Becker replied: "I don't know what Mr. Canno did."

Becker visited the PI plant in Hyannis, toured the facility, viewed a recycler in operation, and saw products that were produced from recycled plastic. Becker claims that PI personnel told him that the recycler was the only machine of its type. In fact, the recycler was not unique; instead, as we have found in many cases involving substantially similar machines, several comparable machines were available in 1981 and 1982 ranging in price from $20,000 to $200,000. See, e.g., Provizer v. Commissioner, T.C. Memo. 1992-177.

Becker was also told that PI had put an enormous amount of research and development (i.e., 10 to 12 years' worth) into the creation and production of the recyclers. When he asked to see the cost records for some kind of independent verification, however, his request was denied. Becker was informed that such information was proprietary and secret, and that he would just have to take PI's representations as true. Becker decided to accept PI's representations after speaking with Miller (corporate counsel to PI), Canno (who had never been to PI's plant or seen a

recycler), and a surrogate judge from Rhode Island who did business in the Boston-Cape Cod area (and who had no experience in engineering or plastics materials). Becker testified that he was allowed to see PI's internal accounting controls regarding the allocation of royalty payments and PI's record-keeping system in general. In Provizer v. Commissioner, supra, though, this Court found that "PI had no cost accounting system or records."

Becker confirmed in his testimony that he relied on the memorandum and discussions with PI personnel to establish the value and purported uniqueness of the recyclers. Becker testified that he relied upon the reports of Ulanoff and Burstein contained in the offering materials, despite the fact that: (1) Ulanoff's report did not contain any hard data to support his opinion; (2) Ulanoff was not an economics or plastics expert; (3) Becker did not know whether Burstein was an engineer; and (4) Burstein was Miller's client and was not an independent expert.

Becker further explained in his testimony that in the course of his practice when evaluating prospective investments for clients, he focuses on the economics of the transaction and investigates whether there is a need or market for the product or service. The records indicate, though, that Becker overlooked several red flags regarding the economic viability of and market for the recyclers. The memorandum warned that there was no established market for the recyclers. Becker never saw any

marketing plans for selling the pellets (the product of the recyclers) or leasing the recyclers. He accepted representations by PI personnel that they would be marketing the recyclers to clients and that there was a sufficient base of end-users for the machines; yet he never saw PI's client list. At the time of the closing of the various partnerships, Becker did not know who the end-users were or whether there were any end-users actually committed to the transaction.

Becker purportedly checked the price of the pellets by reading trade journals of the plastics industry. He did not, however, use those same journals to investigate the recyclers' purported value. In concluding that the SAB partnerships would be economically profitable, Becker made two assumptions that he concedes were unsupported by any hard data: (1) That there was a market for the pellets, and (2) that market demand for them would increase.

Becker had a financial interest in the SAB recycling partnerships generally. Directly or indirectly he received fees of more than $500,000 with respect to the SAB recycling partnerships. Becker also received fees for investment advice from some individual investors and from the SAB recycling partnerships for preparing their partnership returns. As Becker himself indicated in his testimony, potential investors could not

have read the memorandum and remained ignorant of the financial benefits accruing to him.

Petitioner is a very well-educated and highly accomplished and sophisticated attorney. Without question, he possessed the intellect, skills, experience, and resources to have the viability of the SAB transactions thoroughly investigated either by himself or by an independent qualified expert. Petitioner advised Becker to visit PI as part of his purported due diligence and claims that he relied on Becker for the bona fides and viability of the SAB transactions, including the valuations. Yet Becker's expertise was in taxation, not plastics materials or plastics recycling, and his investigation and analysis of the Plastics Recycling transactions reflected this circumstance. Moreover, Becker indicated that he was careful not to mislead any of his clients regarding the particulars of his limited investigation. As he put it: "I don't recall saying to a client I did due diligence * * * [Rather,] I told [my clients] precisely what I had done to investigate or analyze the transaction. I didn't just say I did due diligence, and leave it open for them to define what I might or might not have done."[11]

_____

[11] We note that petitioner testified that the expert opinions of Ulanoff and Burstein had passed petitioner's review partly because of Becker's representation. With regard to SAB Resource, petitioner claims that he had instructed Becker to:

go up to Hyannis and make sure that there were machines
(continued...)

The purported value of the recyclers generated the
deductions and credits in this case, and that circumstance was
clearly reflected in the memorandum. Certainly Becker recognized
the nature of the tax benefits and, given his education and
experience, petitioner should have recognized it as well. Yet
neither petitioner nor Becker verified the purported value of the
recyclers. Becker confirmed in his testimony incorporated in
this record by stipulation that he relied on PI for the value of
the recyclers. An investor as sophisticated as petitioner either
learned or should have learned the source and shortcomings of
Becker's valuation information when Becker reported to him and
"precisely" disclosed "what [he] had done to investigate or

---

[11](...continued)
there, that there were orders for machines there, that
the machines were producing product of the type that
were described in the expert opinions as to what the
machines were supposed to generate, or at least
appeared to do that, and to see if there was some
reasonable relationship to justify the price of the
machine. [Emphasis added.].

According to petitioner, Becker confirmed that he had performed
the suggested tasks. With regard to SAB Foam, petitioner
testified that he discussed the valuation with Becker on the same
basis as with the previous transaction (i.e., SAB Resource).

We consider petitioner's testimony inconsistent with
Becker's testimony, and as to this matter we consider Becker's
testimony reliable and petitioner's alleged recollection
unreliable. See supra note 10 to the effect that this problem
was known to petitioner and his counsel, who chose not to call
upon Becker for clarifying testimony.

analyze the transaction."  Accordingly, we hold that petitioner did not in good faith or reasonably rely on Becker as an expert or qualified professional working in the area of his expertise to establish the fair market value of the recyclers and the viability or bona fides of the SAB transactions.  Becker never assumed such responsibility, and he fully described the particulars of his investigation, taking care not to mischaracterize it as "due diligence".

In the end, petitioner indirectly and Becker directly relied upon PI personnel for the value of the recyclers and the economic viability of the SAB Foam transactions.  See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion."  As explained above, Becker did not have any education, special qualifications, or professional skills in plastics materials or plastics recycling.  A taxpayer may rely upon his adviser's advice and expertise (in this case accounting and tax advice) only where such reliance is objectively reasonable, but it is not reasonable or prudent to rely upon a tax adviser regarding matters outside his field of expertise or with respect to facts that he does not verify.  See Addington v. Commissioner, 205 F.3d at 58; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C.

Memo. 1994-329, affd. 72 F.3d 123 (3d Cir. 1995); Rogers v. Commissioner, T.C. Memo. 1990-619.

### 3. Miller

Petitioner also contends that he reasonably relied on Miller. He knew of Miller by reputation and met with Miller, along with Becker and attorneys from Boylan & Evans, to review the SAB Foam memorandum. Petitioner testified that Miller specifically assured him that he could rely on the valuations attached to the memorandum.[12] Other than this one-time meeting with Miller, petitioner's interaction with Miller was indirect through his partner Lewin.

When first approached by Lewin, in response to the offering memorandum for SAB Resource, Miller was supportive of the investment. With regard to the value of the recyclers, Miller was supportive of the expert reports by Ulanoff and Burstein. The memorandum disclosed that Miller was a 9.1-percent shareholder of F&G, was corporate counsel to PI, and represented Raymond Grant, the sole shareholder of ECI. The memorandum also noted that "Miller [would] receive substantial additional

---

[12] Petitioner testified:

I relied upon the opinions of experts that were hired for the purpose of providing that information and had no reason not to rely upon the opinions of the experts. They were highly qualified, it was confirmed to me by * * * [Elliot] Miller that he knew the experts, that he met with them and that they were people upon whose opinion you could rely.

compensation for representing PI in connection with this transaction." Not surprisingly, Miller was supportive of SAB Foam.

Nothing in the record suggests that Miller had any expertise or knowledge with respect to plastics or plastics recycling, or that petitioner believed he had any such knowledge or expertise. There is also no showing that petitioner had any special or enduring friendship with Miller. While petitioner claims he had great respect for Miller, his relationship with Miller was indirect, through Lewin's tenuous acquaintance with Miller. Any direct contact with Miller was focused solely on the review of the memorandum. Given the extent to which Miller was immersed in the SAB partnerships, how much he stood to benefit financially, and his lack of expertise regarding plastics materials and plastics recycling, we do not consider petitioner's purported reliance on Miller reasonable or in good faith. "It is unreasonable for taxpayers to rely on the advice of someone who they should know has a conflict of interest." Addington v. Commissioner, supra at 59. See Vojticek v. Commissioner, supra, to the effect that advice from such persons "is better classified as sales promotion."

4.  Cohen and Lewin

Petitioner also relied upon his partners Cohen and Lewin.[13] Cohen's knowledge of the transaction was derived from his review of the memorandum and his discussions with Becker.  In addition, Cohen testified that Becker told him he could rely on the valuations attached to the memorandum.[14]  We already have established, though, that petitioner may not reasonably rely on Becker's advice.  Since Cohen himself lacked the expertise and knowledge of the pertinent facts to provide informed advice to petitioner, any advice he gave petitioner about SAB Foam plainly was of very limited value.  See David v. Commissioner, 43 F.3d 788 (2d Cir. 1995).  Cohen was a partner and a coinvestor rather than an adviser on whom petitioner could rely with respect to the transaction here.

We also hold that it was not reasonable for petitioner to rely upon the advice received from Lewin.  As an associate for Miller & Summit, Lewin may have learned about business practices

---

[13]  Petitioner testified that "there was a very, very close professional as well as a personal and social relationship among us" and that they "shared information on a daily basis".

[14]  We note that Cohen testified:  "I remember we talked about the valuations that were obtained and I remember him telling me in words or in substance that I could rely on those valuations."  We consider Cohen's testimony inconsistent with Becker's testimony, and as to this matter we consider Becker's testimony reliable and Cohen's alleged recollection unreliable. See supra note 10 to the effect that this problem was known to petitioner and his counsel, who chose not to call upon Becker for clarifying testimony.

of PI long ago, but that in no way establishes him as an authority about PI or the plastics industry. When Lewin was employed by Miller and was assigned work for PI, that company was located in New Jersey under different ownership and had not yet manufactured any recyclers. By the time of the transactions in issue PI had moved to Hyannis, Massachusetts. Nothing in the record establishes that Lewin had any special knowledge about PI or its business in 1981-82. Lewin's knowledge of SAB Foam is derived primarily from the memorandum and Miller.

B. <u>Alleged Experts</u>

Petitioner contends that Dooskin and Sacco provided the requisite independent analysis of the investment. We disagree. Dooskin and Sacco, neither of whom had any knowledge of the plastics recycling industry, reviewed the memorandum for, at most, 7 hours combined. Their only knowledge of SAB Foam came from the memorandum (i.e., promotional material). Dooskin testified that he informed Lewin the investment "passed muster", but that the economics of the investment "was dependent upon the valuation of the equipment". Petitioner, however, failed to undertake the necessary due diligence and seek a thorough and independent analysis of the value of the recyclers despite Dooskin's warning. We are not convinced that Dooskin's and Sacco's review of the memorandum was any more than a very limited inquiry on behalf of Lewin. Neither petitioner nor his partners

made any separate payment for professional services by Dooskin and Sacco, and consequently they could not expect the accountants to do more than read the memorandum for form and apparent professionalism, potential benefits, and obvious dangers.

C. Petitioner's Relationship With Becker and Miller

Regardless of the foregoing, petitioner contends that petitioner's alleged "deep and longstanding professional relationship" with his advisers justified his reliance on them. We disagree. See Barlow v. Commissioner, T.C. Memo. 2000-339; cf. Dyckman v. Commissioner, T.C. Memo. 1999-79; Zidanich v. Commissioner, T.C. Memo. 1995-382. Petitioner was sufficiently experienced and sophisticated to know that SAB Foam was a tax shelter, and that the value of the transaction depended on the value of the underlying assets; and he failed to consult either an independent appraiser or anyone with expertise in plastics recycling.

In addition, the evidence does not support petitioner's claims that he had a unique and special relationship with his advisers Becker and Miller. Cf. Dyckman v. Commissioner, supra (absolving taxpayers from the negligence penalty, in part, because of the long-term special relationship of trust and friendship between the taxpayers and their adviser).

First, petitioner claims to have a particularly close relationship with Becker. Petitioner and Becker were clients of

each other.  Becker, however, testified that he had a "very close relationship with the majority of [his] clients."  Petitioner was not singled out, and nothing in the evidence demonstrates that Becker treated petitioner any differently from any other client.[15]  Becker offered the investments in SAB Foam and other similar partnerships to many of his clients.

Second, petitioner contends that Lewin "kept in touch" with Miller over the 10 years after he left Miller & Summit.  At trial, however, Miller testified that after Lewin left the firm, they "rarely" kept in touch.  On this matter, we consider Miller a more reliable witness than either petitioner or Lewin.  Miller's testimony clearly shows that he had no special and close relationship with Lewin during the years in issue.  In addition, Miller's testimony does not suggest that petitioner had any significant contact with Miller other than at the meeting with Boylan & Evans to discuss the memorandum.

Petitioner asserts that Lewin also had an especially close relationship with PI.  Lewin testified, however, that he did not

---

[15]  Becker testified:

> there is nothing different that I told to one client about the same issue than I told to another client. There may have been things I said to one client that might not have been said to another.  But, if I spoke about one issue while I might not have used precisely the same words, in substance, * * * what was said to one client on one matter, was said to every other client when that matter was discussed.

do any work for PI after he left Miller & Summit, and that was 10 years before the years in issue. As noted above, by the time in issue PI was under new ownership in a new location, and there is no reason to believe Lewin had any great knowledge about the company or its business in 1982.

D. Miscellaneous

We dismiss petitioner's contention that his allegedly successful 1981 investment in SAB Resource evidenced the reasonableness of the 1982 investment in SAB Foam. Petitioner received a royalty payment within 3 months of his investment in addition to the credits and deductions. Petitioner argues that this makes the case different from other similar cases and makes his subsequent investment in SAB Foam reasonable. The modest royalty was not sufficient to change the character of the deal.

Petitioner's assertion that the amount invested was "relatively small" is irrelevant when considering the amount of tax benefits quickly claimed. The tax benefits and risks of the transaction were substantial, and they were set forth in the memorandum for anyone to see. Undoubtedly investors as sophisticated as petitioner and his partners knew the size of the potential benefits and risks here or should have known them if they had been properly careful.

E. Conclusion as to Negligence

Under the circumstances of this case, petitioner failed to

exercise due care in claiming large deductions and tax credits with respect to SAB Foam on his Federal income tax return. In view of petitioner's sophistication, experience, and education, it was not reasonable for petitioner to rely as he did on an interconnected group of advisers, promoters, and insiders, none of whom had any expertise in plastics recycling. Petitioner should have been able to determine that the recyclers were not unique, that they were not worth the amount ascribed to them, and that SAB Foam lacked economic substance and had no potential for profit. None of the so-called advisers undertook a good faith investigation of the fair market value of the recyclers or of the underlying economic viability or financial structure of SAB Foam. Further, most of petitioner's professional advisers had a financial interest in either SAB Foam or another similar partnership. The Plastics Recycling transaction was a sham, and, as a sophisticated attorney, petitioner should have been able to figure this out if he really had tried. Upon consideration of the entire record, respondent's determinations that petitioner is subject to negligence penalties under section 6653(a)(1) and (2), with respect to his tax return for 1982, are sustained.

Issue 2. Piggyback Agreement

Petitioner argues that he is entitled to the benefits of the Stipulation of Settlement for Tax Shelter Adjustments (piggyback agreement) applicable to Plastics Recycling cases. Petitioner

claims he is in essentially the same position as the taxpayers in Fisher v. Commissioner, T.C. Memo. 1994-434, and Estate of Satin v. Commissioner, T.C. Memo. 1994-435.  Additionally, petitioner argues that in the stipulation of facts in the present case, "the parties unequivocally stipulated that petitioner agreed to be bound to the lead cases under the piggyback agreement.  (Supp. Stip., pars. 34-35)."  Respondent disagrees with these arguments, and we agree with respondent.

In Fisher and Estate of Satin this Court summarized the background of the piggyback agreement in the Plastics Recycling group of cases.  On June 12, 1987, this Court ordered that the lead counsel for the taxpayers in the Plastics Recycling cases and respondent designate test or lead cases which would present all issues involved in the Plastics Recycling cases.  In a letter dated August 14, 1987, respondent notified the Court that lead counsel for the taxpayers and respondent had selected the following docketed cases as the lead cases in the Plastics Recycling group:  (1) Fine v. Commissioner, docket No. 35437-85; (2) Miller v. Commissioner, docket No. 10382-86; and (3) Miller v. Commissioner, docket No. 10383-86.  In early 1988, the Fine case concluded without trial.  The parties, thereafter, selected, and the Court designated, the case of Provizer v. Commissioner, docket No. 27141-86, as a lead case along with the two Miller cases.

After the lead counsel for the taxpayers and respondent agreed upon the test cases, respondent prepared a piggyback agreement with respect to the Plastics Recycling project so that taxpayers who did not wish to litigate their cases individually could agree to be bound by the results of the test cases. Fisher v. Commissioner, supra; Estate of Satin v. Commissioner, supra. The piggyback agreement, as set forth in the Fisher and Estate of Satin cases, provides as follows:

> With respect to all adjustments in respondent's notice of deficiency relating to the Plastics Recycling tax shelter, the parties stipulate the following terms of settlement:
>
> 1.  THE ABOVE ADJUSTMENT IS THE ONLY ISSUE IN THIS CASE;
>
> 2.  The above adjustment(s), as specified in the preamble, shall be determined by application of the same formula as that which resolved the same tax shelter adjustments with respect to the following taxpayer(s):
>
> Names(s): Harold M. Provizer and Joan Provizer v. Commissioner of Internal Revenue
> Tax Court Docket No.: 27141-86
>
> Names(s): Elliot I. Miller v. Commissioner of Internal Revenue
> Tax Court Docket No.: 10382-86
>
> Names(s): Elliot I. Miller and Myra K. Miller v. Commissioner of Internal Revenue
> Tax Court Docket No.: 10383-86
>
> (hereinafter the CONTROLLING CASE)
>
> 3.  All issues involving the above adjustment(s) shall be resolved as if the petitioner(s) in this case was/were the same as the taxpayer(s) in the CONTROLLING CASE;

a.  If the Court finds that any additions to tax or the section 6621(c) interest are applicable to the underpayment attributable to the above-designated tax shelter adjustment(s), the resolution of the tax shelter issue and the applicability of such addition to tax or interest to that tax shelter issue in the CONTROLLING CASE, whether by litigation or settlement, shall apply to petitioner(s) as if the petitioner(s) in this case was/were the same as the taxpayer(s) in the CONTROLLING CASE;

4.  If the adjustment is resolved in the CONTROLLING CASE in a manner which affects the same issue in other years (e.g., * losses in later years or affects depreciation schedules), the resolution will apply to petitioners' later years as if the petitioners in this case was/were the same as the taxpayer(s) in the CONTROLLING CASE;

5.  A decision shall be submitted in this case when the decision in the CONTROLLING CASE (whether litigated or settled) becomes final under I.R.C. sec. 7481;

6.  If the CONTROLLING CASE is appealed, the petitioner(s) consent(s) to the assessment and collection of the deficiency(ies), attributable to the adjustment(s) formulated by reference to the Tax Court's opinion, notwithstanding the restrictions under I.R.C. sec. 6213(a);

7.  The petitioner(s) in this case will testify or provide information in any case involving the same tax shelter adjustment, if requested; and

8.  The petitioner(s) in this case consent(s) to the disclosure of all tax returns and tax return information for the purpose of respondent's discovering or submitting evidence in any case involving the same shelter adjustment(s).

The piggyback agreement was signed by counsel for the taxpayers and respondent in the Fisher and Estate of Satin cases and filed with the Court on September 12, 1988.  Thereafter, the two Miller cases were settled, and agreed decision documents in those cases

were entered by the Court on December 22, 1988.  The settlement provided that the taxpayers were not liable for the additions to tax under section 6653(a) or increased interest for tax-motivated transactions under section 6621(c) (Miller settlement).  Fisher v. Commissioner, T.C. Memo. 1994-434; Estate of Satin v. Commissioner, T.C. Memo. 1994-435.

This Court decided Provizer v. Commissioner, T.C. Memo. 1992-177, on March 27, 1992.  In our Provizer opinion, and in the affirmance, all of the Plastics Recycling issues were decided for respondent, including the additions to tax under section 6653(a) and increased interest under section 6621(c).  Respondent did not notify the taxpayers in the Fisher and Estate of Satin cases or notify any other taxpayers of the settlement of the Miller cases. Respondent ultimately attempted collection from the Fisher and Estate of Satin taxpayers pursuant to our decision in the Provizer case and paragraph 5 of the piggyback agreement set forth above.  For reasons explained more fully in our above-cited opinions, we held that the taxpayers in the Fisher and Estate of Satin cases were entitled to be bound by the Miller settlement.

Petitioner contends that the protest letter is the equivalent of a piggyback agreement that would entitle him to the Miller settlement.  We disagree.  The piggyback agreement is an

intricately developed contract[16] with specific provisions tailored to the Plastics Recycling group of cases. Only the execution of a piggyback agreement by both petitioner and respondent could reflect the parties' mutual assent to settle the instant case based on the disposition of the lead case. See Fisher v. Commissioner, supra, and Estate of Satin v. Commissioner, supra, in which counsel for the taxpayers and respondent signed the piggyback agreement. Neither petitioner's counsel (or counsel for the general partner) in this case nor respondent's counsel executed a piggyback agreement. Petitioner's contention that the protest letter approximates a piggyback agreement is mistaken. At best, the protest letter indicates an intention that petitioner might be willing to enter into a formal piggyback agreement, but nothing in the record indicates that petitioner followed up on any such intent.

The protest letter itself indicates an intention "to follow the Tax Court's decision in the lead cases" but omits any mention of following a settlement of the lead cases, although that possibility is specifically mentioned in paragraph 5 of the piggyback agreement. Moreover, within a month after the Miller settlement was executed, Becker as TMP, having become aware of

---

[16] The protest letter itself indicates an intention "to follow the Tax Court's decision in the lead cases" but omits any mention of following a settlement of the lead cases, although that possibility is specifically mentioned in paragraph 5 of the piggyback agreement.

that settlement, submitted to respondent a clarification that SAB Foam did not wish to be bound by the settlement and, therefore, withdrew any statement of intention to be bound by any other case.

The facts of this case are that petitioner's TMP did not execute the piggyback agreement. Instead he made it clear that he did not wish to settle the case but to rely upon the results of litigation. Petitioner's unpersuasive argument is that, now that the litigation of the lead case and many others has been decided unfavorably to his position, he should be considered to have accepted the piggyback agreement that his TMP explicitly rejected.

Additionally, petitioner argues that a portion of the stipulation of facts amounts to a concession by respondent's counsel that petitioner is entitled to the Miller settlement. The stipulation paragraphs are as follows:

> 34. On September 28, 1988 Robert L. Steele, on behalf of the Tax Matters Partner of SAB Foam Recycling Associates, filed a protest against the adjustments to the 1982 and 1983 tax years proposed by the Internal Revenue Service resulting from an examination of SAB Foam Recycling Associates. In such protest the Tax Matters Partner of SAB Foam Recycling Associates agreed to follow the Tax Court's decision in the following lead cases: Miller v. Commissioner, Docket No. 10382-89; Miller v. Commissioner, Docket No. 10383-86; and Provizer v. Commissioner, Docket No. 27141-86. A copy of the protest of the Tax Matters Partner of SAB Foam Recycling Associates dated September 28, 1988 is attached hereto and marked as Exhibit 10-J. [See supra pp. 14-15.]

35.  On January 20, 1989 Stuart Becker, as the Tax Matters Partner of SAB Foam Recycling Associates, sent a letter to the District Director of the Internal Revenue Service withdrawing the September 28, 1988 agreement to be bound by the lead cases. A copy of the January 20, 1989 letter is attached hereto as Exhibit 11-J. [See supra p. 15.]

The stipulation paragraphs quoted above merely summarize the language of the protest letter and the withdrawal letter and refer to attached exhibits for the specific language. The language of the stipulation does not support the conclusion that respondent agreed that the protest letter was equivalent to an executed piggyback agreement. Petitioner's counsel essentially argues that by stipulation respondent's counsel has agreed to concede the issues in dispute in this case. The language of the stipulation does not support this startling conclusion, nothing else in the record supports it, and respondent's counsel clearly and explicitly has denied it. We disagree with petitioner's counsel's interpretation of the stipulation of facts.

Accordingly, we hold that petitioner is not entitled to the benefits of the Miller settlement or the piggyback agreement concerning Plastics Recycling cases.

To reflect the foregoing,

Decision will be entered under Rule 155.